**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WILLIAM "JACK" BAXTER, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 11-cv-2133 (RCL) |
| ISLAMIC REPUBLIC OF IRAN, et al. | ) ) ) | |
| Defendants. | ) ) ) | |

| | | |
|---|---|---|
| WILLIAM "JACK" BAXTER, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 18-cv-1078 (RCL) |
| SYRIAN ARAB REPUBLIC, et al. | ) ) ) | |
| Defendants. | ) ) ) | |

**REPORT OF SPECIAL MASTER RE: FSIA CLAIMS OF**
**THE ESTATE OF DAVID APPLEBAUM, THE ESTATE OF NAAVA APPLEBAUM,**
**DEBRA APPLEBAUM, NOSSON ("NATAN") APPLEBAUM, YITZHAK APPLEBAUM,**
**SHIRA APPLEBAUM MARESKY, SHAYNA APPLEBAUM ABRAMSON,**
**TOVIBELLE APPLEBAUM KALKER, AND**
**THE ESTATE OF JACQUELINE APPLEBAUM**

This action is brought pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28

U.S.C. § 1605A, by the Estate of David Applebaum, the Estate of Naava Applebaum, Debra

Applebaum, Nosson ("Natan") Applebaum, Yitzhak Applebaum, Shira Applebaum Maresky,

Shayna Applebaum Abramson, Tovibelle Applebaum Kalker, and the Estate of Jacqueline

Applebaum (together, the "Applebaum Plaintiffs") for damages resulting from the deaths of Dr.

David Applebaum and his daughter, Naava Applebaum, who were murdered in a terrorist attack

on September 9, 2003.  In accordance with the Administrative Plan Governing Special Masters, Federal Rule of Civil Procedure 53, and the Federal Rules of Evidence, the Special Master has received testimonial and documentary evidence to assist in formulating and recommending any damages to which the Applebaum Plaintiffs may be entitled.

## BACKGROUND

On Tuesday evening, September 9, 2003, a Hamas operative, Ramez Simi A`bu-Salem, entered the basement of Café Hillel in Jerusalem and detonated a bomb strapped to his body ("September 9 Attack").  The explosion killed seven and injured 50.  Among the dead were Dr. David Applebaum and his daughter Naava Applebaum, who was to be married the following day.

## PROCEDURAL HISTORY

On November 30, 2011, plaintiffs sued the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS") (together, the "Iranian Defendants"), the Syrian Arab Republic, and the Syrian Air Force Intelligence (together, the "Syrian Defendants") (CA No. 1:11-cv-02133 (RCL) for their material support of Hamas proxies who launched ten terrorist attacks in Israel between 2001 and 2004.  ECF No. 1.  Plaintiffs seek compensatory relief for those killed or injured in the attacks, solatium damages for their immediate family members, and monetary damages for those financially impacted by the incidents.

Plaintiffs served the Iranian Defendants with copies of the Complaint via diplomatic channels on September 16, 2012, in accordance with 28 U.S.C. § 1608(a)(4).  ECF No. 15. Their failure to file a responsive pleading by the statutorily prescribed deadline prompted plaintiffs to move for an entry of default on May 5, 2015, ECF No. 24, which the Clerk of Court entered on July 14, 2015.  ECF No. 26.

On August 3, 2015, plaintiffs moved for a default judgment against the Iranian Defendants, ECF No. 28, asking the Court to take judicial notice of the Eastern District of New York's findings in *Linde v. Arab Bank, PLC*, 95 F. Supp. 3d 287, 330–31 (E.D.N.Y. 2015), a case implicating the attacks under review here.  The Court declined to do so and, by Memorandum and Order entered on March 31, 2016, denied plaintiffs' motion for judgment, citing a lack of evidence demonstrating defendants' material support in furtherance of the attacks.  ECF No. 29.  On January 31, 2017, plaintiffs renewed their motion for liability against the Iranian Defendants, ECF No. 30, which the Court granted on September 27, 2019.  ECF No. 41.

On May 8, 2018, the Court severed the Syrian Defendants due to problematic service. ECF No. 31.  Plaintiffs subsequently served the Syrian Defendants in accordance with 28 U.S.C. 1604(a)(4) (CA No. 1:18-cv-01078 (RCL)), ECF No. 39, and moved for entry of default on October 29, 2020, (ECF No. 41), which the Clerk of Court entered on November 2, 2020.  ECF No. 42.  On May 31, 2022, plaintiffs moved for default judgment, ECF No. 45, which the Court granted on  July 19, 2022.  ECF Nos. 48 and 49.

This Report and Recommendation focuses on the action brought by the Applebaum Plaintiffs against the Iranian and Syrian Defendants for their complicity in the September 9 Attack.

**<u>APPLEBAUM PLAINTIFFS</u>**

**<u>THE ESTATE OF DAVID APPLEBAUM</u>**

The Estate of David Applebaum supports its claim for compensatory relief through the Declaration of David's son, Natan Applebaum ("NA-Decl."), and his widow, Debra Applebaum ("DA-Decl."), to which the estate appended a letter confirming David's business arrangement

with Shaare Zedek Medical Center ("Shaare Zedek Letter") (Ex. 1); a TEREM Business Plan ("TEREM Plan") (Ex. 2); and a forensic economic report prepared by the Center for Forensic Economic Studies (the "CFES"), dated September 4, 2020 ("DA-CFES-Rpt.").

**Estate of David Applebaum—Testimony**

David Applebaum was born in New York in 1952, was ordained as a rabbi at the Brisk Yeshiva in Chicago, attained a master's degree in biological sciences from Northwestern University and a medical degree from the Medical College of Ohio.  NA-Decl. ¶¶ 11, 12; DA-Decl. ¶ 20.

At the time of his death, David was the "Director of the Shaare Zedek Medical Emergency Department ("SZMD") and the Founder and CEO of TEREM, a chain of Urgent Care Centers across the Greater Jerusalem area."  DA-Decl. ¶ 21; NA-Decl. ¶ 13.  In the months before his murder, the "American Committee" for SZMD contracted to pay David $30,000 annually for "guiding major gifts, writing articles, participating in an NYU Downton program, coming to the United States three (3) times a year for donor programs and meetings, and maintaining donor relationships."  DA-Decl. ¶ 22; Shaare Zedek Letter.

While at TEREM, David "was paid an annual salary to be a doctor, plus some additional amounts for his service as the CEO."  DA-Decl. ¶¶ 23–24.  David declined TEREM's offer of a more lucrative salary "because he wanted the money to be reinvested in the business."  *Id*.; NA-Decl. ¶ 15.  According to Natan, who has served as CEO of TEREM since 2012, "the CEO's current annual compensation package is valued at approximately 750,000 NIS."  NA-Decl. ¶ 16.  At the time of David's death, TEREM was operating five clinics.  DA-Decl. ¶ 25.  As of 2020, the organization had "29 clinics and [saw] over 800,000 patients per year." *Id*.; NA-Decl. ¶ 18; TEREM Plan.

Debra describes David as an "emergency room doctor who treated victims of dozens of suicide bombings in Israel." DA-Decl. ¶ 26. She recounted how, in 1984, David provided medical treatment to a gunshot victim during an ongoing attack. Natan recalls his father rushing to the man and proceeding to "operat[e] on him while the shooting continued." NA-Decl. ¶ 19. In 1986, the Knesset recognized David with "the Quality of Life Award for treating terror victims on King George Street in Jerusalem while bullets flew around him." *Id*.

David pioneered the creation of immediate care clinics designed "to divert non-emergency cases from hospital emergency rooms while delivering faster care to patients who would have had long waits for emergency room staff." *Id*. He was credited with "transforming the delivery of emergency care in Israel" and considered "a master of emergency medicine." *Id*. According to Debra, David desired to "work in his profession as long as possible." DA-Decl. ¶ 27.

**The Estate of David Applebaum—Economic Damages**

David Applebaum's estate supports its prayer for economic relief through the submission of an economic report prepared by the CFES, which forensically analyzed David's economic losses after reviewing: (1) responses to David Applebaum's Economic Questionnaire; (2) a May 31, 2005 Letter from Paul S. Glasser, National Executive Director, American Committee for Shaare Zedek Medical Center in Jerusalem; (3) a May 18, 2005 Letter from Brodie & Co., Certified Public Accountants (Israel); (4) a November 23, 1987 Letter from David Applebaum, MD to Dr. Stark; (5) Various Tax Documents of David Leslie Applebaum (Applebaum 00215–00433); (6) the TEREM Business Plan of Dr. Applebaum (Applebaum 00150–00186); (7) a "Spreadsheet of Historic TEREM Chief Executive Salaries (2001 to 2019)"; and (8) a

"Spreadsheet of Historic TEREM Chief Executive Benefits (2006 to 2019)."  DA-CFES-Rpt. at 1.

From these sources in addition to "information [] expressed . . . by counsel," the CFES ascertained that David (1) was 50.7 years old when he was murdered; (2) completed his medical degree in 1978; (3) was the CEO of TEREM Urgent Care Network, a company he founded in approximately 1987 [both Debra and Natan maintain TEREM was founded in 1989]; (4) also served as the Director of the Emergency Surgery Department at Shaare Zedek; (5) was under contract with the American Committee for Shaare Zedek to perform fundraising duties commencing in 2003; (6) resided in Israel; and (7) is survived by his wife, Debra and five of his children.  *Id*. at 2.

The CFES overlaid this information onto statistical data generated by the Organization for Economic Co-Operation and Development ("OECD"); the Israel Central Bureau Of Statistics; the National Insurance Institute of Israel; the Journal of Forensic Economics; PwC, *Tax Summaries* and *Employer's Contributions*; the Jerusalem Post, *Analysis of Israeli Tax Rates in 2019*; and GovInfo.gov: *Economic Indicators*, July 2020.

Applying these statistical indicators, the CFES projected David would have had a life expectancy of 84.3 years and would have worked either until age 67.0 (the Israeli national retirement age for men), age 69.4 (the effective retirement age as calculated by the OECD), or age 73.5 (based on David's age and level of education on the date of his death).  *Id*. at 4.

The CFES then incorporated Dr. Applebaum's 2003 income as TEREM's CEO (238,847 NIS), his annualized compensation at Shaare Zedek (190,391 NIS), and his annual compensation at AC Shaare Zedek in 2003 (131,368 NIS) as a base for lost earnings beginning September 9, 2003.  The CFES then adjusted David's lost earnings to reflect future growth of 2.05% (applying

Page 6 of 45

OECD projections); Israeli taxes at an effective tax rate of 38.2%; U.S. income taxes at 1.73%; personal maintenance expenditures at rates ranging from 46.2% to 60.7% annual earnings (depending on his household size at the time of calculation); lost National Insurance benefits at 0.70%; and TEREM annual compensation benefits at 8.7% between 2004 to 2006, and at 21.3% between 2020 and 2026. *Id*. at 4–8.

The CFES discounted these future values to present value by 1.75% (the average yield on high-grade Municipal Bonds as of August 7, 2020). *Id.* at 8. Applying these figures and utilizing an exchange rate of 1 NIS to $0.29 and $1 to 3.44 NIS, the CFES calculated the present value of Dr. David Applebaum's economic loss to be 3,185,060 NIS ($923,667) at the retirement age of 67.0; 3,872,696 NIS ($1,123,082) at the retirement age of 69.4; and 5,045,099 NIS ($1,463,079) at the retirement age of 73.5. *Id*. at 9, 10.

## THE ESTATE OF NAAVA APPLEBAUM

The Estate of Naava Applebaum supports its claim for economic relief through the Declarations of Debra Applebaum ("DA-Decl.") and Natan Applebaum ("NA-Decl.") bolstered by a CFES forensic report dated July 2, 2020 (NA-CFES-Rpt.).

### The Estate of Naava Applebaum—Testimony

Naava Applebaum was born in Israel in February 1983 and, at all relevant times, has been a U.S. citizen. At the time of her death, Naava had "completed her second year of national service volunteering and supporting children with cancer" and planned to study chemistry or genetics at the Hebrew University of Jerusalem. DA-Decl. ¶ 29; NA-Decl. ¶ 21. Naava was described by her mother as "an incredibly bright and hard-working person with limitless potential" who would "have been extremely successful in her pursuits, most likely in the health science or medical fields." DA-Decl. ¶ 30.

**The Estate of Naava Applebaum—Economic Damages**

The CFES forensically analyzed Naava's economic losses after reviewing Responses to Naava Applebaum's and David Applebaum's individual Economic Questionnaires.  NA-CFES-Rpt. at 1.  From these sources, in addition to the information provided by counsel, the CFES ascertained that Naava (1) was 20.5 years old when she was murdered; (2) had completed a high school diploma; (3) was approximately two years into her mandatory military service; (4) expressed an interest in pursuing a career in biology and genetics with a goal toward curing cancer; (5) was born into a family of considerable academic achievement: her father completed a medical degree, her mother had two master's degrees, one brother attained a medical degree, another graduated from Columbia University with an MBA and a sister attained a bachelor's degree; (6) is survived by her mother and five siblings; and (7) resided in Israel at the time of her death.  *Id*. at 2.

The CFES overlaid this information onto statistical data generated by the OECD; the Central Bureau Of Statistics of Israel; the National Insurance Institute of Israel; the Jerusalem Post, *Analysis Of Israeli Tax Rates in 2019*; nbn.org ("Nefesh B'Nefesh)—a website about Israeli military national service; PwC: *Tax Summaries* and *Employer's National Insurance Contributions*; and GovInfo: *Economic Indicators*, May 2020 and *Economic Report of the President*, February 2020.

Applying these statistical indicators, the CFES projected that Naava had a life expectancy of 86.9 years and would have remained in the workplace either until age 62.0, the national retirement age for Israeli women, or age 66.0, the effective retirement age calculated by the OECD.  *Id*. at 2.  The CFES further assumed that, upon completing her compulsory military service in September 2004, Naava would have pursued higher education in keeping with her

family's academic attainments and with her stated aspiration to pursue a career in biology and genetics and, by January 2009, would have realized yearly earnings of 172,764 NIS, consistent with similarly situated individuals with 16+ years of schooling. *Id*. at 3.

The CFES next adjusted Naava's lost earnings to reflect future growth of 2.05% (representing the average annual rate of change of Israel wages from 1998 to 2018), taxes at 14.23%, personal maintenance expenditures at 49.7%, and net fringe benefits at 1.72% of annual earnings. *Id.* at 4–5.

The CFES discounted these future values to present value by utilizing a 2.70% return on principal investment (the average yield on high-grade Municipal Bonds as of June 7, 2020) and a 4.20% return on the reinvested interest (the average yield of these bonds between 2000 to 2019). *Id.* at 5. Applying these figures and utilizing an exchange rate of 1 NIS to $0.29 and $1 to 3.44 NIS, the CFES calculated the present value of Naava Applebaum's lost wages to be 2,413,585 NIS ($699,940) at the retirement age of 62.0, and 2,640,119 NIS ($765,635), at the retirement age of 66.0. *Id.* at 6, 7.

## DEBRA APPLEBAUM

Debra Applebaum, David Applebaum's wife and Naava Applebaum's mother, supports her claim for relief through testimonial evidence captured in a Declaration dated September 2, 2020 ("DA-Decl.").

### Debra Applebaum—Testimony

Debra Applebaum was born in Ohio in 1957 and, at all relevant times, has been a U.S. citizen. DA Dec. at ¶2. Debra married David in 1977 and had six children: Naava, Natan, Shira, Shayna, Yitzhak, and Tovibelle (alternatively, Tovibelle), all of whom were U.S. citizens at the time of the September 9 Attack. *Id*.

At approximately 11:30 p.m. on September 9, 2003, Debra was at home when she heard "a large explosion sounding like a bomb going off, followed by sirens." DA-Decl. ¶ 4. Concerned about David and Naava, who were out for the evening, Debra attempted unsuccessfully to reach them by cellphone. *Id*. ¶¶ 4, 5. It was the "eve of Naava's wedding," and Debra knew the two were headed to Café Hillel "so that David could give Naava some last-minute advice on marriage and making a Jewish home." *Id*. ¶ 8. When the news broadcast that the explosion had occurred at that location, Debra's children, Shira and Yitzhak, ran to the scene but were unable to locate their father or sister. *Id*. ¶ 6. Yitzhak returned home and took his mother to Shaare Zedek Medical Center. *Id*. ¶ 7.

After waiting an hour, Debra was informed that David and Naava were among those who perished in the blast. DA-Decl. ¶ 7. She recounts how her "grief and trauma" rendered everything "a blur" and how she went through "indescribable" pain. *Id*. ¶ 8. Instead of celebrating Naava's wedding, the family attended two funerals. *Id*.

After the mourning period, Debra tried "to keep to routine (as much as possible)." DA-Decl. ¶ 10. Her older children "returned to their respective programs," Debra resumed her Master's Program in Bible Studies, and her two youngest children returned to high school. *Id*. Debra recalls how her youngest child, Tovibelle, became "a bit challenging in the classroom" and remained a disciplinary problem despite "different types of counseling." *Id*. ¶ 11. Debra's "younger kids" began seeing a social worker "once or twice a year to discuss the trauma and how it impacted them." *Id*.

Debra finds the Sabbath and holidays "particularly difficult times," and while "relatives helped very much," the absence of her husband and daughter continues to be agonizing. DA-Decl. ¶¶ 12, 13.

Four of Debra's children married in the years following the attack. DA-Decl. ¶ 16. Had David had been alive, he would have "been the primary organizer" of those events. *Id*. Instead, Debra had to arrange a "wedding for 600 guests, a Shabbat weekend at home hosting 80 guests and editing a Torah publication." *Id*. ¶ 17. Debra keenly felt her husband's absence when her children, now adults, were "looking into careers in the medical field, whether as CEO of medical clinics, an ER physician, a paramedic and a nurse." *Id*. ¶ 19.

## NOSSON ("NATAN") APPLEBAUM

Natan Applebaum, David Applebaum's son and Naava Applebaum's brother, supported his claim for compensatory damages through testimonial evidence elicited in a Declaration dated September 7, 2020 ("NA-Decl.").

### Natan Applebaum—Testimony

Natan Applebaum was born in Ohio in January 1979 and, at all relevant times, has been a U.S. citizen. NA-Decl. ¶ 2.

Natan learned of the terrorist attack from his mother, who told him that David and Naava were "at the café where the bombs went off." NA-Decl. ¶ 5. Natan was 24 years old at the time and living with his family in Jerusalem. *Id*. Like the rest of his family, he looked forward to Naava's wedding the following day. *Id*. "[F]rightened and upset," Natan ran to the site of the explosion and was eventually directed to the Shaare Zedek Medical Center, where he was asked to supply his father's and sister's dental records. *Id*. ¶¶ 5, 6. The family was first told David had died and "sometime later," they were informed of Naava's death. *Id*. Natan recounts how friends, family, and the press began "flocking to the hospital." *Id*.

A few weeks before the attack, Natan had completed his "studies in London" and returned to Jerusalem, where he was "looking forward to spending quality time" with his father

and sister.  NA-Decl. ¶ 9.  Married with a 10-month-old daughter and a son on the way, Natan

eagerly anticipated his children "developing relationships with their amazing grandfather and

inspiring aunt."  *Id*. ¶¶ 10, 11.  Natan's life has never been "the same without them," and "the

pain of their absences is constant and everlasting."  *Id*. ¶ 11.

Natan's loss was compounded by the fact that both he and his father worked at TEREM,

which forced Natan to confront his father's absence both at home and at work.  NA-Decl. ¶ 20.

He believes the terrorist attack has hurt him "professionally" as well as emotionally, as he finds

it "very hard to focus on work."  *Id*.  He "temporarily left TEREM after a few years" to pursue

his "Masters in Business Administration from Columbia," after which he "worked at McKinley

Associates, before returning to TEREM full time in 2010."  *Id*.

## YITZHAK APPLEBAUM

Yitzhak (also spelled "Yitschok") Applebaum, David Applebaum's son and Naava

Applebaum's brother, supports his claim for solatium damages through testimonial evidence

elicited in a Declaration dated June 23, 2020 ("YA-Decl.").

### Yitzhak Applebaum—Testimony

Yitzhak Applebaum was born in Ohio in February 1981 and, at all relevant times, has

been a U.S. citizen.  YA-Decl. ¶ 2.

On the day of the bombing, Yitzhak was at home with his family when they heard "the

explosion, as our home was in close proximity."  *Id*. ¶ 4.  When they discovered the bomb had

exploded at the nearby Café Hillel, Yitzhak and his sister, Shira, drove to the scene to find their

father and sister.  *Id*.  Upon their arrival, the siblings split up, and Yitzhak was mistakenly

informed by a medic at the scene that all of the bombing victims were taken to one of the

Hadassah hospitals.  *Id*. ¶ 5.  Shira remained at the scene with a friend, and while Yitzhak was

driving to a Hadassah facilities, a friend called and broke the news that David had been killed and Naava "severely injured" in the attack. *Id*. Yitzhak returned home to pick up his mother and accompany her to Shaare Zedek Medical Center. *Id*. Arriving at the emergency room, they were told Naava had also died and that both bodies had been transported "to Abu Kabir–the National Center for Forensic Medicine in Tel Aviv." *Id*. Later, Yitzhak was forced to undergo the "horrifying experience" of identifying the bodies. *Id*. ¶ 7.

The September 9 Attack "significantly impacted" Yitzhak's "quality of life." *Id*. ¶ 9. Despite efforts to "best [] cope with the[ir] deaths," there was no diminishing the impact of losing his "beloved sister and lifelong friend" and his "father, teacher, and role model"—the "anchor of the whole family." *Id*. ¶¶ 11, 12.

Following in his father's footsteps, Yitzhak enrolled in medical school, completed his residency and fellowship in Emergency Medicine at the University of Maryland," and now works "as an attending and clinical assistant professor." *Id*. ¶ 13. His life mission is to "complete [his] father's vision for improving health care and Emergency Medicine." *Id*.

Yitzhak believes the loss of David and Naava has affected his health, leading him to become emotionally "constrict[ed]," which has had a "limiting effect" on his personal and professional relationships. *Id*. ¶ 14. Yitzhak no longer takes pleasure in the things he used to enjoy and finds himself in a "continuous marathon" to fill the void left by his father's absence. *Id*. ¶ 16. Yitzhak considers himself "lucky to be married with five kids" but is "saddened that they will never have their grandfather David nor their aunt Naava." *Id*. ¶ 18.

**SHIRA APPLEBAUM MARESKY**

Shira Applebaum Maresky, David Applebaum's daughter and Naava Applebaum's sister, supports her claim for compensatory damages through testimony elicited in a Declaration dated

June 30, 2020 ("SAM-Decl.") and a Supplemental Declaration dated May 24, 2021 ("SAM-Supp. Decl."). Shira supports her prayer for economic damages with two forensic economic reports prepared by the CFES dated June 2, 2021 and June 17, 2022 ("SAM-CFES-Rpt."). The Special Master will consider only the more recent of the two.

### Shira Applebaum Maresky—Testimony

Shira Maresky was born in Jerusalem in February 1985 and, at all relevant times, has held dual Israeli and U.S. citizenship. SAM-Decl. ¶ 3.

On September 9, 2003, Shira was at home when she heard an "explosion" followed by sirens. SAM-Decl. ¶ 4. Television news broadcasts reported a bombing on Emeq Refaim Street in Jerusalem, the location of Café Hillel, where her father and sister had gone earlier that evening. *Id.* ¶ 5. Together, Shira and her brother Yitzhak drove to the scene, parked as close to the café as possible, and ran towards the commotion. *Id.* ¶ 4. Upon her arrival, Shira saw Naava lying on a gurney being loaded onto an ambulance, her white tank top red with blood. *Id.* ¶ 5. Shira tried to board the ambulance but was ordered off by a medic, who indicated he was unsure to which hospital they were transporting Naava. *Id.*

Stepping out of the ambulance, Shira noticed "glass, blood and shredded pieces of human organs and flesh" on the ground. *Id.* ¶ 7. Yitzhak advised her to return home, pick up their mother, and drive to Shaare Zedek. *Id.* After "hours of waiting, worrying and hoping," the family was told David had died. *Id.* ¶ 8. Soon after, hospital personnel notified them that Naava was also dead. *Id.* That evening, they returned home to prepare for two funerals instead of Naava's wedding. *Id.* ¶ 9. Shira has since felt "uncomfortable at every wedding." *Id.* ¶¶ 10, 11.

In 2003–2004, Shira's national service required her to serve in a "youth village with Ethiopian immigrants"—a job to which she could not devote her complete attention, given her inability to "sleep at night" because she was plagued with flashbacks and nightmares. *Id.* ¶ 11.

Page 14 of 45

In 2005, Shira began training for a "Bachelor's in Emergency Medical services and a Masters in disaster management (mass casualty management)"—a decision inspired by the September 9 Attack. *Id*. ¶¶ 6, 12. She found it "too hard" to be away from her family, and frequently returned home, which "affected" her academic performance. *Id*. ¶ 12. She "know[s] [she] could have done better." *Id*.

Since her marriage in August 2007, Shira has been unable to sleep alone in the house and insists on having "all the windows shut and an alarm system active." *Id.* ¶ 14. If her husband, Ariyel, is away, Shira arranges her schedule to work the night shift to avoid being home alone. *Id*. When Ariyel was drafted for a month of reserve duty in 2009, Shira requested an exemption for him. *Id*. ¶ 15. When the military refused, Shira refused to let him go, resulting in Ariyel being "sent to a military prison for a week."

Ariyel and Shira have "five beautiful children," of whom Shira is "highly overprotective," fearing that "bad things will happen to them." *Id*. ¶ 16. She insists they "wear GPS devices so [she] can see where they are always." *Id*. Shira is "suspicious of every person" she sees and finds it difficult to trust people, having "lost faith in humankind." *Id*. ¶¶ 16, 17. Although Shira has never considered therapy or counseling, she concedes it might have been beneficial. *Id*. ¶ 21. She believes her training as a paramedic has familiarized her "with the symptoms of Post-Traumatic Stress Disorder" and that she "exhibit[s] those symptoms," though she has "never been formally diagnosed." *Id*.

### Shira Applebaum Maresky—Economic Damages

In her Supplemental Declaration, Shira explains that even with her "Master's in Mass Casualty Management," the terror attack "impacted" her "professionally." SAM-Supp.-Decl. ¶ 4. She notes how "it was very important" for her to work at TEREM as a way to "feel close" to

her father and to continue "his legacy"—a decision she believes kept her "out of the competitive job market where [she] could have earned a higher salary that would have been more in line with what the typical person with [her] level of education earns working in Israel." *Id*. at 4. At TEREM, she serves as a "Paramedic and a manager of the nursing staff." *Id*.

Shira provided a CFES report in support of her claim for economic damages. The CFES forensically analyzed her financial losses after reviewing her June 30, 2020 Declaration; May 24, 2021 Supplemental Declaration; Pay Statements from 2005 to 2010 and 2012; and a video recording of a speech Shira gave on May 31, 2011, discussing the impact the September 9, 2003 attack had on her career. SAM-CFES-Rpt. at 1.

From these submissions, the CFES ascertained that Shira: (1) was 18.6 years old when her father and sister were murdered; (2) completed a Bachelor's degree in Emergency Medical Services and a Master's degree in Disaster Management; (3) chose those fields of study due to the September 9 Attack; (4) worked at TEREM, the clinic her father co-founded, to continue his legacy despite the possible adverse impact on her competitiveness in the job market; (5) also pursued a career as a paramedic and ambulance driver; (6) is married with five children; and (7) resides in Israel. *Id*. at 2.

The CFES overlaid this information onto statistical data generated by the OECD; the Central Bureau Of Statistics of Israel; the National Insurance Institute of Israel; the Jerusalem Post, *Analysis Of Israeli Tax Rates in 2019*; PwC: *Tax Summaries* and *Employer's National Insurance Contributions*; and GovInfo: *Economic Indicators*, April 2021 and *Economic Report of the President*, February 2021.

Applying these statistical indicators, the CFES projected that Shira has a life expectancy of 87.1 years and would remain in the workplace either until age 62.0, the national retirement

age for Israeli women, or age 66.0, the effective retirement age calculated by the OECD.  *Id.* at 3. The CFES also assumed that had the September 9 Attack not occurred, Shira would have realized annual earnings of 184,500 NIS by July 1, 2007, consistent with similarly situated individuals with 16+ years of schooling.  *Id.*  Given the terrorist incident, however, the CFES applied Shira's average yearly earnings of 78,101 NIS as a base figure against which it adjusted her lost earnings to reflect future growth of 2.25% (the average annual rate of change in average annual wages in Israel from the OECD from 1999 to 2019); taxes at 9.08%; and net fringe benefits at 3.08% annual earnings.  *Id.* at 4–5.

The CFES then discounted these future values to present value by utilizing a 1.97% return on principal investment (the average yield on high-grade Municipal Bonds between May 2020 and April 2021) and a 4.04% return on the reinvested interest (the average yield on these bonds from 2001 to 2020).  *Id.* at 5.  Applying these figures and utilizing an exchange rate of 1 NIS to $0.307 and $1 to 3.25 NIS, the CFES calculated the present value of Shira Applebaum Maresky's economic losses to be 3,951,694 NIS ($1,213,170) at the retirement age of 62.0, and 4,264,600 NIS ($1,309,232) at the retirement age of 66.0.  *Id.* at 6, 7.

## SHAYNA APPLEBAUM ABRAMSON

Shayna Applebaum Abramson, David Applebaum's daughter and Naava Applebaum's sister, supports her claim for compensatory relief through testimonial evidence elicited in a Declaration dated September 22, 2020 ("SAA-Decl.") to which she appended a Therapy Summary dated September 15, 2020.  She also supplied a Supplemental Declaration dated May 25, 2021 ("SAA-Sup. Decl.") and to bolster her claim for financial damages, Shayna supplied a CFES forensic report dated June 2, 2021.  ("SAA-CFES-Rpt.").

### Shayna Applebaum Abramson—Testimony

Shayna Applebaum Abramson was born in Jerusalem in February 1989 and, at all relevant times, has been a dual citizen of the United States and Israel. SAA-Decl. ¶ 2. At the time of the terrorist attack, Shayna was 14 years old and living with her family in Jerusalem. *Id*.

Shayna recounts how, on September 9, 2003, she heard an explosion followed by sirens. *Id*. ¶ 4. Knowing that her father and sister were at the nearby Café Hillel, Shayna attempted to reach them on their cellphones with no success. *Id*. Upon learning the blast occurred on the same street as Café Hillel, Shayna's brother and other sister proceeded to the site. *Id*. When Debra learned that the victims were being transported to Shaare Zaadek, she sent Shayna and Tovibelle to neighbors' house while she headed to the hospital. *Id*. Several hours later, Debra called and asked the neighbor to bring Shayna and Tovibelle to the hospital. *Id*.

Upon arriving at the hospital, they were told their father had died. *Id*. ¶ 4. They were later informed Naava had also been killed. *Id*. Shayna found it "inconceivable" her father and sister were murdered on the eve of Naava's wedding, and that the family would be attending their funerals. *Id*. ¶ 5. For the "first year or two" following the attack, Shayna "did not sleep much at night," and when she did, she had "nightmares." *Id*. ¶ 8. She was in a state of "constant fear and anxiety" and had difficulty concentrating on her studies. *Id*.

Because Shayna kept her grief and sadness to herself, she was "never sent to therapy or sought professional help" to cope with the effects of the terrorist attack, although she regrets not having done so. *Id*. ¶¶ 9–10.

Shayna did, however, seek psychological help for "mild postpartum depression" following the birth of each of her four children. *Id*. ¶¶ 12, 14. Since September 2019, she has been seeing a therapist who has helped her understand she had not properly addressed the loss of her father and sister, a contention borne out by the supplied September 14, 2020 "Therapy

Summary" written by her clinical social worker and psychotherapist. *Id*. ¶¶ 13–14. Shayna professes to "need" sleeping pills and "treatment" to alleviate her anxiety. *Id*. ¶15.

### Shayna Applebaum Abramson—Economic Damages

In her Supplemental Declaration, Shayna testified that, following the September 9 Attack, she "lost interest" in school, encountered "severe difficulty focusing" in class, and saw her grades "suffer[]." SAA-Sup Decl. ¶ 3. Shayna believes she "lost out on many career options" as a result. *Id*. Before the attack, she considered "going to medical school" like her father, but her poor grades following the attack led her to believe she would not be accepted. *Id*. Instead, Shayna pursued a career in nursing, "making far less" than she would have as a doctor. *Id*. Shayna also claims to be "incapable of working full time" due to the attack and dedicates one day every week to a "personal healing program which includes therapy and [P]ilates." *Id*.

In its report, the CFES forensically analyzed Shayna's economic losses after reviewing her September 22, 2020 Declaration, her May 25, 2021 Supplemental Declaration, and her Pay Statements from 2012 to 2020. SAA-CFES-Rpt. at 1. From these sources, the CFES ascertained that Shayna (1) was 14.6 years old when her father and sister were murdered; (2) considered attending medical school to follow in her late father's footsteps; (3) pursued a career in nursing; and (4) resides in Israel with her husband and four children. *Id*. at 2.

The CFES overlaid this information onto statistical data generated by the OECD; the Central Bureau Of Statistics of Israel; the National Insurance Institute of Israel; the Jerusalem Post, *Analysis Of Israeli Tax Rates in 2019*; PwC: *Tax Summaries* and *Employer's National Insurance Contributions*; and GovInfo: *Economic Indicators*, April 2021 and *Economic Report of the President*, February 2021.

Applying these statistical indicators, the CFES projected that Shayna has a life expectancy of 87.1 years and would remain in the workforce either until age 62.0 years, the national retirement age for Israeli women, or age 66.0, the effective retirement age calculated by the OECD. *Id.* at 2. The CFES further assumed Shayna would have continued her education, consistent with the academic attainments of her immediate family members and would have secured annual earnings of 184,500 NIS by July 1, 2012, comparable to similarly situated individuals with 16+ years of schooling. *Id*. at 3.

The CFES next adjusted Shayna's lost earnings to reflect future growth of 2.25% (representing the average annual rate of change in average annual wages in Israel from the OECD from 1999 to 2019), taxes at 11.2%, and net fringe benefits at 2.16% annual earnings. *Id.* at 4–5. The CFES then discounted these future values to present value by utilizing a 1.97% return on principal investment (the average yield on high-grade Municipal Bonds between May 2020 and April 2021) and a 4.04% return on the reinvested interest (the average yield on these bonds from 2001 to 2020). *Id.* at 5.

Applying these figures and utilizing an exchange rate of 1 NIS to $0.307 and $1 to 3.25 NIS, the CFES calculated the present value of Shayna Applebaum's economic loss to be 2,691,433 NIS ($826,270) at the retirement age of 62.0, and 2,928,128 NIS ($898,935) at 66.0. *Id.* at 6, 7.

**TOVIBELLE APPLEBAUM KALKER**

Tovibelle Applebaum Kalker supports her claim for compensatory relief through testimonial evidence elicited in a Declaration dated May 28, 2021 ("TAK-Decl."), a Supplemental Declaration dated May 28, 2021 ("TAK-Supp.-Decl."), and a CFES forensic report dated June 2, 2021 ("TAK-Econ.-Rpt.").

**Tovibelle Applebaum Kalker—Testimony**

Tovibelle was born in April 1991 in Jerusalem and, at all relevant times, has been a U.S. citizen.  TAK-Decl. ¶ 2.

Tovibelle was 12 when a suicide bomber killed her father and sister.  *Id*. ¶ 5.  From her perspective, her "childhood ended right there" as she was "forced to grow up and deal with the types of struggles that normally only adults deal with."  *Id*.  Tovibelle recalls how her father and sister were at Café Hillel that evening and that, upon discovering a bombing had exploded in that vicinity, her brother Yitzhak and sister Shira rushed to the scene.  *Id*. ¶ 6.  Tovibelle and her sister Shayna stayed with a neighbor while the rest of the family hurried to the hospital.  *Id*.  Natan eventually called the neighbor to tell her the tragic news.  *Id*.  After hanging up, the neighbor took Tovibelle and Shayna to the hospital.  *Id*.  Natan was waiting for them outside and broke the news that their father had died but that Naava's status was still unknown.  *Id*.  Tovibelle remembers the family being told "sometime later" that Naava had also died.  *Id*.

In the years following the attack, while in junior high and high school, Tovibelle "was really lost" and "barely slept out of sadness and sorrow."  *Id*. ¶ 7; TAK-Supp.-Decl. ¶ 3.  Believing she "was fine," she could not accept the assistance offered to her by her "teachers, the school psychologist and other professionals."  *Id*.  Tovibelle admits to being "a bit challenging in the classroom" and "demonstrating disciplinary issues."  TAK-Decl. ¶ 8; TAK-Supp.-Decl. ¶ 3.

While the loss of her sister "was devastating," her father's death was particularly "heartbreaking," as she "depended" on him "for everything."  TAK-Decl. ¶ 10.  To this day, Tovibelle feels "stress and anxiety about everything that happened," and upon learning of subsequent terrorist attacks, her "feelings of grief and sadness" return.  *Id*. ¶ 11.  She believes her "life would have been much different" were her father and sister still alive and finds it "difficult .

. . to articulate," as "re-visiting the attack brings back an overwhelming wave of emotion that [she] simply prefer[s] not to confront.".  *Id*. ¶ 12.

Since the September 9 Attack, Tovibelle has become anxious if she does not hear from her husband, worrying "that something bad might have happened." *Id*. ¶ 13.  She often passes by the area where the attack occurred, and while "over time, it has gotten better," she has not stopped grieving.  *Id*. ¶ 14.  Tovibelle finds "[c]ertain days" "particularly difficult," such as her father's and sister's birthdays, the anniversary of their deaths, and "Israel's Memorial Day for the victims of terror and fallen soldiers." *Id*. ¶ 15.  She notes how whenever she encounters employees of the Shaare Zedek Hospital or TEREM, they get "very excited or emotional, ask a lot of questions and go out of their way," which, while appreciated, serves only to bring her "back to the night of the attack." *Id*. ¶ 16.

### Tovibelle Applebaum Kalker—Economic Damages

Tovibelle claims the September 9 Attack has also "had a tremendous impact" on her financially.  TAK-Supp.-Decl. ¶ 4.  She graduated from Ono Academic College in Jerusalem in 2015 with a "degree in Land of Israel Studies," which she equates with a "Humanities degree" in its "relatively limited rigor" and its "limited subsequent career opportunities." *Id*.  Tovibelle believes "for sure" that had her "father been alive, he would have absolutely discouraged [her] from taking the easy way out" and would have provided "the support and guidance" she needed to "stay on the more science/medical-oriented study and career track that he pursued and that all my siblings pursued." *Id*.

Tovibelle started college at Bar Ilan University in 2011, where she studied biology, but found "it was too much work" given her "condition." *Id*. ¶ 5.  She attributes her "difficulty focusing" to the terrorist attack and her inability to confront "challenging" coursework to her

father's absence. *Id*. Feeling "depressed" and consumed with "self-pity," Tovibelle "elected to go to a smaller, less rigorous private college with a study track" that would not "burden" her "as much emotionally with constant thoughts" about the loss of her father. *Id*. Tovibelle believes the "lighter educational coursework" has resulted in "limited career options and lower-paying jobs." *Id*. ¶ 6. And because she was compelled to change directions academically, Tovibelle entered the workforce a "year later" than she initially anticipated. *Id*.

Supplementing her testimony, Tovibelle Applebaum Kalker provided an economic report prepared by the CFES, which forensically analyzed her losses after reviewing her June 24, 2020 Declaration, her May 28, 2021 Supplemental Declaration, and Form 106s (Israeli Annual Statements to Employees) from 2013, and 2015. TAK-CFES-Rpt. at 1. From these sources, the CFES ascertained that Tovibelle (1) was 12.4 years of age when the September 9 Attack occurred; (2) entered college in 2011, where she studied biology; (3) transitioned to a humanities degree due to her emotional trauma; (4) graduated in 2015 with a degree in Land of Israel Studies from Ono Academic College; (5) believes that were her father alive, he would have encouraged her to continue her studies in biology and provided her with the support and guidance to embark on a career in science or medicine; and (6) resides with her husband and three children in Israel. *Id*. at 2.

The CFES overlaid this information onto statistical data generated by the OECD; the Israel Central Bureau Of Statistics; National Insurance Institute of Israel; PwC *Tax Summaries* and *Employer's Contributions*; the Jerusalem Post, *Analysis of Israeli Tax Rates in 2019*; and GovInfo.gov: *Economic Indicators*, April 2021 and *Economic Report of the President*, February 2021.

Applying these statistical indicators, the CFES projected that Tovibelle has a life expectancy of 87.1 years and would remain in the workplace either until age 62.0, the national retirement age for women in Israel, or until age 66.0, the effective retirement age calculated by the OECD. *Id*. at 3. The CFES further assumed that, but for the terrorist attack, Tovibelle would have continued her studies in biology, attained an educational level comparable to her parents, and realized annual earnings of 184,500 NIS as of July 1, 2014, similar to the earnings of similarly situated individuals with 16+ years of education. *Id*. The CFES then utilized Tovibelle's current earnings of 39,457 NIS as a base from which they adjusted her lost earnings to reflect future earnings growth of 2.25%, taxes at 8.2%, and net fringe benefits at 3.15% annual earnings. *Id*. at 3–4.

The CFES then discounted these future values to present value by utilizing a 1.97% return on principal investment (the average yield on high-grade Municipal Bonds between April 2020 and May 2021) and a 4.04% return on the reinvested interest (the average yield on these bonds from 2001 to 2020). *Id.* at 5. Applying these figures and employing an exchange rate of 1 NIS to $0.307 and $1 to 3.25 NIS, the CFES calculated the present value of Tovibelle Applebaum Kalker's economic loss to be 5,183,410 NIS ($1,591,307) at the retirement age of 62.0 and 5,808,496 NIS ($1,783,208) at the retirement age of 66.0. *Id.* at 6, 7.

**THE ESTATE OF JACQUELINE APPLEBAUM**

The Estate of Jacqueline Applebaum supports its claim for compensatory damages through the testimony of her daughter-in-law, Debra Applebaum ("DA-Decl."), and her grandson, Natan Applebaum ("NA-Decl.").

Before David's mother, Jacqueline passed away, she resided in the same apartment complex as David and Debra. DA-Decl. ¶ 14. David had always "played a very important role"

in Jaqueline's "physical and financial welfare," and she became "very distressed" over the murder of her son and her granddaughter *Id*. Their deaths caused her considerable "grief" and "suffering" as well as "excruciating and intolerable pains and immense sadness," resulting in Jaqueline falling into a "deep depression" from which she never emerged. *Id*.

Natan attests to his father's pivotal role in Jacqueline's emotional, medical, and financial welfare and recalls how "very distressed" she was over her son's murder and how her grief never subsided. NA-Decl. ¶ 22.

## ANALYSIS

The Applebaum Plaintiffs seek compensatory relief under 28 U.S.C. § 1605A(c) for loss of solatium and economic damages. Upon consideration of the testimonial and documentary evidence presented, and in keeping with the legal framework set out below, the Special Master considers both entitlement to and amount of damages.

## STANDARD OF PROOF

To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent as any other default winner.'" *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 242–43 (D.D.C. 2012) (quoting *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)). In the context of a default judgment, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v. United States*, 967 F. Supp. 2d 246, 313 (D.D.C. 2013) (emphases in original) (*quoting Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). For future damages, a plaintiff must demonstrate entitlement to a "reasonable certainty" or by a preponderance of the evidence and must prove damages by a "reasonable estimate." *Hill v.*

*Republic of Iraq,* 328 F.3d 680, 684 (D.C. Cir. 2003).  For past losses, a plaintiff must "prove the *fact* of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (emphasis added), yet need only "reasonably prove" the amount of damages.  *Hill*, 328 F.3d at 684.

The quantum of proof necessary to trigger an award of damages "may be established by affidavit or declaration which, upon evaluation, the Special Master 'may accept plaintiffs' uncontroverted evidence as true.'" *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75, 85 (D.D.C. 2019) (quoting *Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 161 (D.D.C. 2013)).  *See Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 250 (D.D.C. 2001) (permitting plaintiffs to "prove both liability and damages . . . based on submission of affidavits, without the need for live testimony at a hearing") (citation omitted); *Kim v. Democratic People's Republic of Kore*a, 87 F. Supp. 3d 286, 289 n.1 (D.D.C. 2015) (allowing plaintiffs to "establish the necessary proof for damages through affidavits or live testimony") (citation and internal quotation marks omitted).

Upon consideration of the facts presented, when viewed through the lens of the aforementioned legal framework, the Special Master initially considers whether the Applebaum Plaintiffs have made colorable claims for relief and then recommends those damages that are appropriate under applicable precedent.

### SOLATIUM DAMAGES
(Debra Applebaum, Nosson ("Natan") Applebaum, Yitzhak Applebaum,
Shira Applebaum Maresky, Shayna Applebaum Abramson,
Tovibelle Applebaum Kalker and the Estate of Jacqueline Applebaum)

Debra Applebaum, Natan Applebaum, Yitzhak Applebaum, Shira Applebaum Maresky, Shayna Applebaum Abramson, Tovibelle Applebaum Kalker, and the Estate of Jacqueline Applebaum seek damages for loss of solatium arising from the deaths of David Applebaum and

Naava Applebaum. Before analyzing their individual claims, a brief recitation of the law governing solatium damages is in order.

It is well settled that terrorist acts, "by their very definition," are "extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8,  22 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)). Accordingly, the FSIA provides for the award of solatium damages to compensate for the "'[m]ental anguish, bereavement and grief' resulting from a loved one's death or injury." *Schertzman Cohen v. Islamic Republic of Iran*, CA No. 17-cv-1214 (JEB), 2019 WL 3037868, at *7 (D.D.C. July 11, 2019) (quoting *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356–57 (D.C. Cir. 2018)).

When awarding solatium damages, our courts recognize that family members in direct lineal relationship to the victims injured in a terrorist attack are "presume[d] . . . [to] suffer compensable mental anguish . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim*, 87 F. Supp. 3d at 290 (quoting *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015). To maintain uniformity, courts look for guidance in "prior decisions," *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008), and typically defer to the framework established in *Heiser v. Islamic Republic of Iran* (*Heiser I*), 466 F. Supp. 2d 229, 269 (D.D.C. 2006), awarding $8 million for pain and suffering resulting from the death of a spouse, $5 million to a parent whose child was killed, and $2.5 million to a plaintiff whose sibling was killed, and *Davis*, 882 F. Supp. 2d at 14, establishing a baseline award of $3 million for children of a deceased victim.

These numbers are neither immutable nor "set in stone," *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51,

74 (D.D.C. 2010)), and therefore are subject to deviation where circumstances dictate, at "the discretion of the particular court in each case." *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 43 (D.D.C. 2018) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011)). *See Fritz v. Islamic Republic of Iran*, 324 F. Supp.3d 54, 59–60 (D.D.C. 2018) ("These amounts, however, are merely guideposts, and courts *should* deviate depending on the circumstances.") (emphasis added) (citing *Fraenkel*, 892 F.3d at 361–62).

In that spirit, awards for loss of solatium have been enhanced (1) in the face of "aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering, such as cases involving torture or kidnapping of a spouse," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006); (2) where the "evidence establish[es] an especially close relationship," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D. C. 2014), compared to "the normal interactions to be expected given the familial relationship," *Oveissi*, 768 F. Supp. 2d at 26–27; (3) in the presence of "medical proof of severe pain, grief or suffering on behalf of the claimant," *Roth*, 78 F. Supp. 3d at 403; or (4) where the circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27.

Conversely, downward departures have been imposed where the evidence demonstrates an attenuated relationship between the victim and members of his immediate family. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010). And "where no evidence is offered to show injury that an award of solatium damages might compensate," solatium awards have been denied. *Roth*, 78 F. Supp. 3d at 406. *See Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 46 (D.D.C. 2014) (declining to award solatium damages where the "record does not contain sufficient evidence to support the award of any damages").

Debra Applebaum, Natan Applebaum, Yitzhak Applebaum, Shira Applebaum Maresky, Shayna Applebaum Abramson, Tovibelle Applebaum Kalker, and the Estate of Jacqueline Applebaum have presented colorable claims to recover compensatory damages for the emotional anguish each suffered as a direct result of the murder of David Applebaum and Naava Applebaum. Their suffering is presumed under applicable precedents and amply supported by the supplied declarations.

Debra Applebaum recounts how everything was "a blur . . . given the grief and trauma" and how her pain was "indescribable. She recalled how David would have been the "organizer" of the weddings of their four children who married after the attack and how his guidance would have been instrumental in helping them as they began looking into careers in the medical field. Natan Applebaum's life has never been "the same" since the murder of his father and sister, and "the pain of their absences is constant and everlasting"—a pain compounded by the fact that he and his father worked together, forcing him to confront the loss both at home and at work.

Yitzhak Applebaum was the family member who endured the horrifying task of identifying the lifeless bodies of his father, who was his mentor and role model and the emotional and financial "anchor of the whole family," and his sister, who was his lifelong friend. He has struggled to cope with their deaths. The September 9 Attack caused Shira Applebaum Maresky to suffer insomnia and experience nightmares and flashbacks. She has since been unable to sleep alone in her house, insists "all the windows shut and an alarm system [remain] active," is "suspicious of every person," insists her children wear GPS devices when outside, and has "has lost faith in humankind." Shayna Applebaum Abramson has been plagued by "constant fear and anxiety" after the attack, cannot sleep, has nightmares, and experiences difficulty

concentrating.  Shayna professes to "need" sleeping pills and "treatment" and has been advised by a therapist that she never properly addressed her grief at the loss of her father and sister.

Tovibelle Applebaum Kalker, 12 at the time of the attack, describes Naava's death as "devastating" and her father's murder as "heartbreaking."  She has since felt "really lost," has "barely slept out of sadness and sorrow," became a disciplinary problem, and continues to feel stress and anxiety upon learning of any terrorist attack.  Jacqueline Applebaum became "very distressed" upon learning of the murder of her son, who supported her emotionally, medically, and financially through the years, and her granddaughter.  Their deaths caused her "much grief" and "suffering . . excruciating and intolerable pains and immense sadness."

The evidence, only briefly summarized here, compellingly evidences the close and loving relationship that each shared with David and Naava before their deaths and their anguish losing "the mutual benefit that each family member receives . . . including love, affection, care, attention, companionship [and] comfort."  *Wilson v. City of Chicago*, 758 F.3d 875, 883 (7th Cir. 2014).  Each claimant is entitled to a solatium award.

That said, it must be decided, in the first instance, whether these claimants, having lost more than one family member, are entitled to a cumulative award.  Our courts have held that when a family member is related to multiple victims, the appropriate method for calculating an award "is to establish the family member's baseline at the higher of the figures and then consider whether to grant an upward departure from that higher baseline."  *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40 (D.D.C. 2012).  *See Cohen*, 268 F. Supp. 3d at 26 (holding that baseline is "determined by the victim with whom the Plaintiff has the closest relationship, i.e., the largest individual solatium award"); *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 56 (D.D.C. 2020) (finding the *Wultz* court's approach "compelling"); *Kaplan*, 213 F. Supp. 3d at

39 (approving the decision "to avoid any duplication of damages which potentially might run afoul of the holding in *Wultz*.")

Under the guidelines suggested in *Heiser* and *Davis*, Debra Applebaum is theoretically entitled to $8 million (as David's spouse) and $5 million (as Naava's mother). Similarly, Natan Applebaum, Yitzhak Applebaum, Shira Applebaum Maresky, Shayna Applebaum Abramson, and Tovibelle Applebaum Kalker are each theoretically entitled to $3 million (as David's children) and $2.5 million (as Naava's sibling). (The principle in *Wultz* does not impact the $5 million award for Estate of Jacqueline Applebaum, as her status as Naava's grandparent accords her no standing.).

Applying *Wultz*, however, restricts each to the higher of the awards, which then serves as the baseline against which to determine any enhancements. The next question to be decided is whether an enhancement to the baseline is warranted applying the guidelines enunciated above.

After reviewing the evidence in light of the enhancement categories set out in *Oveissi*, 768 F. Supp. 2d at 26-27, the Special Master finds no cause to deviate from the *Heiser I/Davis* solatium scale apropos of the claims of Jacqueline Applebaum. The record reveals no circumstances, such as kidnapping or torture, that appreciably aggravated her individual pain and suffering. *Greenbaum*, 451 F. Supp. 2d at 108. Moreover, there is no evidence establishing "an especially close relationship" between David and his mother, *Spencer*, 71 F. Supp. 3d at 28, that would distinguish it from "the normal interactions to be expected given the familial relationship," *Oveissi*, 768 F. Supp. 2d at 26-27, or "medical proof" demonstrating she suffered "severe pain, grief or suffering." *Roth*, 78 F. Supp. 3d at 403.

The Special Master does, however, find an enhancement appropriate for Debra Applebaum, Natan Applebaum, Shira Applebaum, Shayna Applebaum, Tovibelle Applebaum and Yitzhak Applebaum.

As described above, courts deviate upward from the solatium baselines in the face of "circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27. Here, David Applebaum and Naava Applebaum were killed on the eve of what was to be Naava's wedding. Their meeting at Café Hillel on September 9 was arranged to discuss her upcoming wedding and for David to offer advice and counsel. Instead of attending Naava's nuptials, the family attended two funerals. It is difficult to conceive of a more anguishing incident to strike a close-knit family anticipating a once-in-a-lifetime celebration than to have the bride and her father brutally murdered the night before. Moreover, the unforeseen and violent nature of the killings has rendered the shock and grief suffered by the family members "all the more intense." *Stethem*, 201 F. Supp. 2d at 90.

In sum, the impact of the September 9 Attack on the Applebaum family went beyond the "type of suffering" typically contemplated by *Heiser*. The Special Master, therefore, recommends each immediate family member receive an enhancement of 25% to the traditional solatium baselines—an increase commensurate with the upward departures sanctioned by the courts in *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 118 (D.D.C. 2015), *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 51–52 (D.D.C. 2016), and *Baker v. Socialist People's Libyan Arab Jamahiriya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011).

For the aforementioned reasons, the Special Master recommends Debra Applebaum receive $8 million (the baseline articulated in *Heiser I*), to which the Special Master recommends an enhancement of 25% for the anguish of losing both David and Naava), for a total of $10

million in solatium damages; Natan Applebaum, Shira Applebaum Maresky, Yitzhak Applebaum, Shayna Applebaum Abramson, Tovibelle Applebaum Kalker each receive $3 million (the baseline articulated in *Davis*), to which the Special Master recommends an enhancement of 25% for the torment of losing their father, David, and sister, Naava) for a total of $3.75 million in solatium damages; and the Estate of Jacqueline Applebaum receive $5 million for the death of her son David (yet ineligible to recover for the death of her grandchild, *see Heiser v. Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 28 (D.D.C. 2009) (limiting "immediate family" members to "one's spouse, parents, siblings, and children")).

## <u>ECONOMIC DAMAGES</u>
(The Estate of David Applebaum, the Estate of Naava Applebaum,
Shayna Applebaum Abramson, Shira Applebaum Maresky, and Tovibelle Applebaum Kalker)

The Estate of David Applebaum, the Estate of Naava Applebaum, Shayna Applebaum Abramson, Shira Applebaum Maresky, and Tovibelle Applebaum Kalker also request pecuniary damages arising out of the September 9 Attack. Before analyzing the particulars of their claims, several overarching principles guiding the Special Master's disposition should be noted.

28 U.S.C. § 1605A, like its statutory predecessor, 28 U.S.C. § 1605(a)(7), establishes a cause of action for economic damages resulting from state-sponsored terrorism. To establish a right to such a recovery, plaintiffs must present "evidence which affords a reasonable basis for measuring the claimant's loss." *Bova v. Islamic Republic of* Iran, CA No. 15-cv-1074 (RCL), 2020 WL 2838582, at *11 (D.D.C. May 31, 2020).

While neither lost earnings (i.e., a loss of monetary income such as wages or earnings) nor lost earnings capacity (i.e., a decrease in the ability to earn income such as loss of future earnings, diminution of ability to earn, or impairment of earning power) "can []ever be predicted with complete confidence," *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 546 (1983),

and "mathematical exactitude is often impossible," *Stearns v. Islamic Republic of Iran*, Case No. 17-cv-0131 (RCL), 2023 WL 4999967, at *4 (August 4, 2023) (quoting *Bova*, 2020 WL 2838582, at *11), pecuniary damages "may be proven by the submission of a forensic economist's expert report," *Roth*, 78 F. Supp. 3d at 402 (citing *Belkin*, 667 F. Supp. 2d at 24), provided the expert's underlying calculations comport with Federal Rule of Evidence 702 and are grounded in well-supported assumptions.  In other words, although "absolute certainty is not required," *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (internal quotation marks and citation omitted), forensic expert testimony must be excluded if based on "unrealistic assumptions regarding the plaintiff's future employment prospects," *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996), or is bottomed on "facts that [are] clearly contradicted by the evidence," *Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 8–9 (D.D.C. 1996), as such testimony "has no significant probative value."  *Villalobos v. American Airlines, Inc.*, No. 96-6413, 1998 WL 1770592, at *6 (S.D. Fla. Nov. 13, 1998).

To guard against such "unsupported speculation," the Special Master is charged with examining "the reasonableness and foundation of the assumptions relied upon by the expert," *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 164–165 (D.D.C. 2017) (quoting *Roth*, 78 F. Supp. 3d at 402), before recommending the adoption of a forensic analysis—a scrutiny enhanced in the face of projected losses "[d]epart[ing] from actual pre-injury earnings." *Estate of Henkin v. Islamic Republic of Iran*, CA No. 18-cv-1273 (RCL), 2023 WL 3319425, at *3 (quoting *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 727 (6th Cir. 2012)).

Plaintiffs have presented evidence of monetary loss through personal testimony bolstered by forensic economic reports prepared by the CFES, whose expertise is a matter of record regarding FSIA damage calculations.  *See*, *e.g.*, *Estate of Steinburg v. Islamic Republic of Iran*,

CA No. 17-cv-1910 (RCL), 2019 WL 6117722, at *8 (D.D.C. November 18, 2019) (recognizing CFES president as "an expert on forensic economics"); *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 90 (D.D.C. 2014) ("Plaintiffs' counsel has presented a written report by the Center for Forensic Economic Studies ("CFES") authored by persons with graduate training appropriate to that task[,]" i.e., "calculating the present value of the [estate's] claim."); *Estate of Botvin*, 873 F. Supp. 2d at 243 ("[P]laintiffs have appropriately provided the court with an expert report. . . . submitted by the Center for Forensic Economic Studies.").

### ECONOMIC CLAIMS BY THOSE DIRECTLY IMPACTED BY THE SEPTEMBER 9 ATTACK

The Special Master will first examine the pecuniary damages claims brought by the Estate of David Applebaum and the Estate of Naava Applebaum—victims directly impacted by the September 9 Attack.

### The Estate of David Applebaum

The CFES estimated David Applebaum's economic losses after reviewing letters from organizations with which David was affiliated, certified tax documents, executive salary summaries and spreadsheets, and business plans.  It then overlaid information gleaned from these sources against generally accepted statistical data to project David's life and worklife expectancies and factor in future growth, tax liability, insurance, and compensation benefits, which it discounted to present value utilizing high-grade Municipal Bonds yields.

The Special Master finds the methodology employed by the CFES appropriate, given its thorough review of source documents, its use of statistical information from well-established sources, its reliance on well-grounded assumptions for life and worklife expectancies, taxes, future growth and benefits, and its utilization of 10-year Municipal Bond rates to adjust lost income to present value.  *See Baker*, 775 F. Supp. 2d at 80 (D.D.C. 2011) (accepting "discounted

future earnings to present value with the average yield on high-grade municipal bonds"). The only variable presented is David Applebaum's worklife expectancy, for which the CFES offers three possible retirement ages: 67.0, 69.4, and 73.5. That choice is narrowed in light of Debra Applebaum's testimony underscoring her husband's stated desire to "work in his profession as long as possible." DA-Decl. ¶ 27. Based on this testimony, coupled with Dr. Applebaum's considerable achievements, the Special Master will assume that, but for the September 9 Attack, David Applebaum would have worked until age 73.5, and recommends his estate received $1,463,079 in economic damages in accordance with the CFES calculations.

### The Estate of Naava Applebaum

The CFES projected Naava Applebaum's economic losses after considering her responses to an Economic Questionnaire and information provided by counsel, coupled with the fact that members of her immediate family had attained advanced degrees. The CFES then overlaid this information onto generally accepted statistical data, which it used to project Naava's life and worklife expectancies, factor in future growth, tax liability, personal maintenance expenditures, net fringe benefits, insurance and compensation benefits, which it then discounted to present value utilizing high-grade Municipal Bonds yields. The CFES then projected Naava's lost wages depending on whether she left the workplace at age 62 or age 66.

Given the lack of earnings information for Naava, the validity of the CFES's calculations hinges on the supposition that she would have attained the academic credentials necessary to pursue a career in biology and genetics. The Special Master finds no reason to question this assumption given Debra Applebaum's testimony that Naava had "completed her second year of national service volunteering and supporting children with cancer"; her stated plan to study chemistry or genetics at the Hebrew University of Jerusalem; coupled with the numerous

advanced degrees attained by her parents and siblings.  Finding CFES's assumptions both reasonable and well-founded, the Special Master need only decide whether Naava Applebaum would remain in the workplace until age 62 or age 66.  Finding no reason to assume otherwise and given the achievements and industry of her parents and siblings, the Special Master assumes Naava Applebaum would have retired at age 66 and, therefore, recommends her estate be awarded $765,635 in economic damages.

**ECONOMIC CLAIMS BY THOSE DERIVATIVELY IMPACTED BY THE SEPTEMBER 9 ATTACK**

Shayna Applebaum Abramson, Shira Applebaum Maresky, and Tovibelle Applebaum Kalker ask for remunerative damages resulting from the deaths of their father and sister.  Their derivative claims require a separate introduction.

The FSIA remedial scheme has traditionally recognized requests for financial relief brought directly by victims of terror.  Adverting to the plain language of 1605A, our courts have also acknowledged the legitimacy of economic claims brought by immediate family members of those victims, customarily solatium beneficiaries, asserting that they were psychologically traumatized by these terrorist acts and suffered a loss of economic capacity (whether in the form of a decreased or impaired abilities to earn) as a result. *See*, *e.g.*, *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 30–31 (D.D.C. 2022) (awarding pecuniary damages to several family members, including the father of a murdered son, who suffered psychological injuries that rendered him unable to work); *Abedini v. Islamic Republic of Iran*, 422 F. Supp. 3d 118, 139 (D.D.C. 2019) (compensation for two-year loss of earnings for the sister of a kidnapping victim); *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012), (awarding financial damages to the son of a kidnapping victim upon proof of lost wages).  *See also Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 71 (D.D.C. 2021) (acknowledging availability of pecuniary

relief for daughter of decedent but declining award due to lack of requisite "indicia of reliability"); *Kar v. Islamic Republic of Iran*, CA No.19-cv-2070 (JDB), 2022 WL 4598671, at *20 (D.D.C. Sept. 30, 2022) (considering yet denying economic damages to daughter of kidnapping victim).

When assessing these derivative claims, the Special Master is mindful that the "loss of earning capacity is an economic concept based upon a medical foundation" which the plaintiff must prove, *Quinones–Pacheco v. American Airlines*, Inc., 979 F.2d 1, 6 (1st Cir. 1992), to a "reasonable certainty" or by a preponderance of the evidence . . . ." *Hill*, 328 F.3d at 684 (citing DAN B. DOBBS, DOBBS LAW OF REMEDIES § 8.1(2), at 361–62, § 8.1(7) at 407 (2d ed. 1993)).

To meet this standard, plaintiffs looking to establish a derivative claim for diminution of earning capacity based on psychological trauma for an event that injured a family member must medically establish both the existence of such trauma and a nexus between said trauma and the purported lost earning capacity.  The need for enhanced scrutiny arises because almost all derivative economic claims arise out of the identical constellation of emotional harms for which solatium is awarded.  To award both solatium *and* economic damages for the same injuries may be technically permissible under a granular reading of the statute, *see Force*, 617 F. Supp. 3d at 30 (distinguishing between the awards, explaining that "solatium damages, which 'are by their very nature unquantifiable,' cannot themselves account for the quantifiable economic losses— including a loss of personal income—that plaintiffs may suffer as a result of a family member's injury or death") (quoting *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015)), it risks running afoul of the well-established principle that bars recovery for the same injury under more than one theory of liability.  *Braun v. Islamic Republic of Iran*, 228 F.Supp.3d

Page 38 of 45

64, 80 (D.D.C. 2017) (citing *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976))

("Where there has been only one injury, the law confers only one recovery, irrespective of the

multiplicity of parties whom or theories which the plaintiff pursues.").  To prevent such an

impermissible duplication underscores the need for expert testimony carving a clear medical

nexus between these injuries and a diminution of economic capacity.

To clarify, such a construct requires, in the first instance, an expert diagnosis of a mental

condition that goes beyond the musings of a claimant.  *See Jefferson v. MilVets Sys. Tech., Inc.*,

172 F.3d 919, 1999 WL 66027, at *1 (D.C. Cir. Jan. 26, 1999) (unpublished) ("Whereas

testimony from lay witnesses may be sufficient to establish that an individual is 'distressed' in

some fashion, it may not be sufficient to establish that an individual suffers from a particular

medical condition such as alcoholism or depression which only professional medical care

providers may be qualified to diagnose.").  *See also Daniels v. Dist. of Columbia*, 15 F. Supp. 3d

62, 70 (D.D.C. 2014) ("Testimony as to the diagnosis and treatment of a patient, and the reasons

therefore, is beyond the ability of the average lay witness' competency and is necessarily based

on 'the expert's scientific, technical, or other specialized knowledge,' in the form of doctors'

medical training and experience.") (citing Fed. R. Evid. 702(a)).  In other words, derivative

claimants should not be accorded the same "presumption" of psychological injury permitted

direct victims of terror.  *Kaplan*, 213 F. Supp. 3d at 36.  *See Schertzman Cohen*, 2019 WL

3037868, at *6 ("The award of damages for physical injuries 'assume[s] severe psychological

injuries.'") (citing *Wamai*, 60 F. Supp. 3d at 92–93); *Braun*, 228 F. Supp. 3d at 84 ("Chana

Braun suffered psychological injuries but no physical injuries and, consequently, might

presumptively be entitled to an award of only $1,500,000") (citation omitted).

Once a psychological injury is corroborated, a claimant must supply medical evidence linking the diagnosed condition to the purported economic losses.  This is because causation between a diagnosed trauma and career impediments can neither be assumed nor explained to a reasonable degree of certainty absent scientific, technical, or specialized knowledge requiring expert testimony.  Unlike situations where an injury and its cause are connected in some apparent way such that common experiences and observations readily explain the relationship and expert testimony is not required, *see, e.g.*, *Hendrickson v. Cooper*, 589 F.3d 887, 892 (7th Cir. 2009) ("[n]o expert testimony is required to assist jurors in determining the cause of injuries that are within their common experiences or observations"), emotional traumas such as Post-Traumatic Stress Disorder, Major Depressive Disorder, and Obsessive Compulsive Disorder can manifest in countless ways depending on factors such as preconditions, the severity of the trauma, medications, therapy, and so on.  The Special Master is of the view that absent expert opinion, it is beyond the ken of the average layperson to comprehend how a particular individual claimant diagnosed with one or more of these ailments will respond and whether one response will be a diminution in the ability to earn.

Shayna Applebaum Abramson, Shira Applebaum Maresky, and Tovibelle Applebaum Kalker, as family members, allege they suffered financial losses as a result of the deaths of David Applebaum and Naava Applebaum.  Their claims are discussed below.

**<u>Shayna Applebaum</u>**

Shayna Applebaum's prayer for financial recompense is supported by her testimony that the September 9 Attack caused her to lose interest in her studies, which foreclosed her from a career in medicine and relegated her to a far less lucrative career in nursing.  She further claims

the attack rendered her unable to work full-time and required her to devote one day every week to a "personal healing program which includes therapy and [P]ilates."

The CFES estimated Shayna Applebaum's losses after reviewing her submissions and applying accepted statistical data to project her losses as $826,270 (retiring at 62) or $898,935 (retiring at 66).  This calculation is grounded in the assumption that, but for the September 9 Attack, Shayna would have attained academic credentials comparable to her family members and secured considerably greater earnings than she did.

The Special Master, while taking no issue with the methodology employed by the CFES, is concerned with its underlying assumption.  Aside from Shayna's testimony that she lost interest in school after the September 9 Attack, there is no support in the record for the proposition that she otherwise would have pursued her academics more diligently.  On that score, the letter from Shayna's psychotherapist is telling.  Drafted in September 2020 and reflecting sessions that commenced in September 2019—16 years after the terrorist attack— the therapeutic assessment, described "as material for the lawsuit," discusses Shayna's loss of her father's guidance and support, as well as issues relating to her neo-natal depression.  There is no discussion of Shayna's academic difficulties or indication she was psychologically, emotionally, or cognitively incapable of achieving her aspirational career goals.  While Shayna's testimony may suffice for an award of solatium damages, it cannot ground a claim for economic losses, as it lacks the requisite "competent evidence"  *Moradi*, 77 F. Supp. 3d at 71.

Finding the CFES's assumption unsupported by the record, the Special Master recommends Shayna Applebaum's claim for economic damages be denied.

**Shira Applebaum Maresky**

Shira Applebaum Maresky prays for economic relief on the grounds that the September 9 Attack led to her decision to work for TEREM, her father's organization, as a way to feel close to him and continue his legacy. She claims her decision resulted in her failure to compete in the job market and earn a higher salary. On this assumption, the CFES created a forensic construct estimating Shira's losses at $1,213,170 or $1,309,232.

The Special Master finds Shira lacks a viable claim for economic losses under the FSIA, as her decision to pursue a career at TEREM was not dictated by circumstance but by choice. *See Kar*, 2022 WL 4598671, at *20 (denying claims where "[p]laintiffs' decisions to pursue less lucrative public-interest careers [were] not necessarily a reasonably certain consequence of the abuse their father suffered") (quoting *Fraenkel*, 892 F.3d at 353). There is no evidence Shira suffered any psychological, emotional, or cognitive impairment as a result of the terrorist attack that limited her career options or foreclosed her opportunities. *See Fraenkel*, 892 F. Supp. 3d at 353 ("To obtain damages against defendants in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur'") (quoting *Hill*, 328 F.3d at 681). The Special Master, therefore, recommends that Shira Applebaum Maresky's claim for economic damages be denied.

### Tovibelle Applebaum Kalker

Tovibelle was almost 12 ½ years old when her father and sister were murdered. Eight years later, she studied biology and then transitioned to a humanities program, eventually earning a degree in Land of Israel Studies from Ono Academic College in 2015—a degree with limited career potential. Tovibelle believes had her father not been murdered, he would have discouraged her from abandoning her biology studies and provided her with the support and guidance needed for her to continue on a science/medical-oriented career track.

Based on the assumption that, but for the attack, Tovibelle would have "continued with her biology studies and pursued education consistent with her parents' educational attainment, the CFES created a forensic construct that resulted in an economic loss projection of $1,591,307 or $1,783,208. The Special Master finds the assumption both speculative and unfounded. *First*, it hinges on the speculation that David, had he not been killed, would not only have encouraged Tovibelle not to abandon her biology coursework but would have prevailed. *Second*, it assumes Tovibelle would have successfully completed her coursework. *Third*, it fails to account for the fact that Tovibelle's claimed academic difficulties occurred eight years after the September 9 Attack. *Fourth*, there is no evidence in the record suggesting that Tovibelle suffered from depression or any other psychological ailment that caused her to switch her academic focus away from biology. In short, Tovibelle has failed to prove that "the consequences of the defendants' conduct," i.e., her father's inability to steer her course of study eight years following the attack, " were 'reasonably certain (i.e., more likely than not) to occur.'" *Fraenkel*, 258 F. Supp. 3d at 353.

The Special Master recommends Tovibelle's request for economic damages be denied.

## PUNITIVE DAMAGES

The Applebaum Plaintiffs ask for punitive damages. The FSIA provides for the award punitive damages to punish and deter the actions for which they are awarded, *Saberi v. Government of Islamic Republic of Iran*, 541 F. Supp. 3d 67, 86–87 (D.D.C. 2021), and"[c]ourts routinely award punitive damages in cases brought under the terrorism exception to the Foreign Sovereign Immunities Act." *Frost v. Islamic Republic of Iran*, 419 F. Supp. 3d 112, 116 (D.D.C. 2020). In *Estate of Bland*, 831 F. Supp. 2d at 150, the court relied on the Supreme Court's opinion in *Philip Morris USA v. Williams*, 549 U.S. 346 (2007), and applied a 3.44 ratio, noting

that several courts had applied that ratio in FSIA cases. *Id*. at 158 (citing *Murphy*, 740 F. Supp. 2d at 75 and *Valore*, 700 F. Supp. 2d at 52).  The Special Master recommends the Court award punitive damages to the Applebaum Plaintiffs and apply the same 3.44 multiplier.

**PREJUDGMENT INTEREST**

The Applebaum Plaintiffs also request prejudgment and post-judgment interest.  The Special Master recommends plaintiffs' request be denied for the reasons articulated in *Maupin*, 405 F. Supp. 3d at, 88–98.

**CONCLUSION**

For the aforementioned reasons, the Special Master recommends that Debra Applebaum receive Ten Million Dollars ($10,000,000) and that Natan Applebaum, Shira Applebaum Maresky, Yitzhak Applebaum, Shayna Applebaum Abramson, Tovibelle Applebaum Kalker each be awarded Three Million Seven Hundred and Fifty Thousand Dollars ($3,750,000); and the Estate of Jacqueline Applebaum be awarded Five Million Dollars ($5,000,000) in solatium damages.

The Special Master further recommends the Estate of David Applebaum be awarded One Million Four Hundred Sixty-Three Thousand and Seventy-Nine Dollars ($1,463,079); the Estate of Naava Applebaum be awarded Seven Hundred Sixty-Five Thousand Six Hundred and Thirty-Five Dollars ($765,635) in economic damages and that Shira Applebaum Maresky, Shayna Applebaum Abramson and Tovibelle Applebaum Kalker's claims for economic damages be denied.

As the Applebaum Plaintiffs' compensatory damages amount to Thirty-Five Million Nine Hundred Seventy-Eight Thousand Seven Hundred Fourteen Dollars ($35,978,714), the Special Master further recommends they receive punitive damages based on a 3.44 multiplier, yielding a

punitive damages total of One Hundred Twenty-Three Million Seven Hundred Sixty-Six Thousand Seven Hundred Seventy-Six Dollars and Sixteen Cents ($123,766,776.16).  Finally, the Special Master recommends plaintiffs' interest claim be denied.

Dated: March 15, 2024

Respectfully submitted,

/s/ Alan L. Balaran,
Alan L. Balaran, Esq.
Special Master